## THE HELMSMAN. [*]

### THE TUSCAN.

(District Court, S. D. New York. January 4, 1924.)

1. Collision ⊛═66.

Evidence *held* to show steamer at fault in collision with scow in tow in comparatively open water.

2. Collision ⊛═75—Failure of scows to carry lights required by International Rules held not to have contributed to collision (International Rules, art 3 [Comp. St. § 7839]; Inland Rules Act, § 2 [Comp. St. § 7906]; Inland Regulations, art. 3 [Comp. St. 7877]).

Failure of scows in tow on high seas to carry red and green lights, required by International Rules, art. 3 (Comp. St. § 7839), instead of white lights, required by regulations of Board of Supervising Inspectors, with approval of Secretary of Commerce, under Inland Rules Act, § 2 (Comp. St. § 7906), *held* not to have contributed to collision with steamer; the tug having carried lights required by Inland Regulations, art. 3 (Comp. St. § 7877), substantially identical with International Rules, art. 3.

In Admiralty. Libel by the Munson Steamship Line against the steam tug Helmsman, Robert Rogers and Frederick E. Jones, claimants, and libel by Frederick E. Jones against the steamer Tuscan, the Munson Steamship Line, claimant, wherein the Munson Steamship Line impleaded the tug

[*] Decree affirmed in 11 F.(2d) 444.

Helmsman. Libel of the Munson Steamship Line dismissed, and interlocutory decree for libelant Jones.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for Munson S. S. Line.

Bigham, Englar & Jones, of New York City (L. J. Matteson, of New York City, of counsel), for the Helmsman and cross-libelant Jones.

WARD, Circuit Judge. November 20, 1920, between 9:30 and 10:30 p. m., the steamer Tuscan was lying about 2½ miles southeast of Scotland Lightship, waiting for a pilot to take her in to New York. The tug Helmsman, with a tow of two loaded dump scows tandem, with a hawser of 200 fathoms to the first scow, F. J. 33, and a hawser of 100 fathoms to the second scow, F. J. 22, making a tow of about 2,000 feet in length, was bound to the dumping ground on the high seas outside of the limits of the inland waters.

There was a light wind from the east, and the tide was ebb; but there was no proof of its force, except the testimony of the pilot that it was setting to the southward about the strength of the ebb, and the testimony of Cameron, second officer of the Tuscan, who is not shown to have any acquaintance with the harbor and coastal tides of New York, that he did not know the strength of the tide, but thought it was about 3 knots. The port bow of the Tuscan, heading about north-northeast, came into collision with the second scow, F. J. 22. Both vessels sustained damage.

The Munson Steamship Line filed a libel against the tug Helmsman, to which Robert Rogers and F. E. Jones filed an answer, as claimants of the tug. F. E. Jones, as owner of the dumper F. J. 22, filed a libel against the steamer Tuscan, to which the Munson Line filed an answer, as claimant, and also filed a petition under the fifty-sixth rule in admiralty, impleading the tug Helmsman. Both causes were tried together.

[1] The statement of counsel for the Munson Line at the time depositions were taken, a few days after the accident and before the libel was filed, as well as its answer to the libel of F. E. Jones, and the testimony of all its witnesses examined by deposition, was that the fault of the Helmsman was in letting her tow sag down under the influence of the ebb tide upon the Tuscan, which was going astern on her engines. I do not believe this was so, because the tide was setting southward more or less in the course of the tow, which is said to have been southeast ½ east. Nor do I credit the estimate of the second officer of the Tuscan that the tide in these wide, open coastal waters could have had a force of anything like three knots. It lay upon the claimant of the Tuscan to give much better evidence of the direction and force of the tide, if it intended to rely upon its effect upon the tow as the cause of the collision. In point of fact, it relied principally upon a situation first developed by the pilot, the only witness it examined at the trial. He said that the Helmsman, after passing the Tuscan, changed her course to starboard, and so brought the tow down upon her. The testimony was quite overwhelming that the tow always remained in line with the tug, and I cannot accept this belated explanation, which is quite inconsistent with the statement of counsel for the Tuscan before the libel was filed, with its pleadings filed, and with the testimony of its witnesses examined by deposition within a few days after the collision.

What, then, did cause the collision? I think it was because, after the Tuscan had begun to proceed to New York on a course to pass the Helmsman and her tow starboard to starboard, the pilot thought he was getting too close, became excited, and rang full speed astern on her engines several times, which had the effect of throwing her bow to starboard toward the tow and bringing her into collision with F. J. 22. The orders to the engines, as given in the rough engine room and deck logs, do not correspond, as appears from the following:

| Deck. | Engine Room. |
| --- | --- |
| P. M. | P. M. |
| 10:20. Proceeding under slow bells astern. | 10:13. Stop. |
| 10:37. Full astern. | 10:38. Half astern. |
|  | 10:39. Full astern. |
| 10:40. Barge rammed ship. | 10:40. Full astern. |
| 10:43. Stop. | 10:45. Stop. |

So no orders were given to the engine, according to the engine room log, between 10:13 and 10:38; whereas, according to the deck log, the steamer was proceeding under slow bells astern between 10:30 and 10:37. But both logs do agree that for some six minutes the engines were working astern, during which period the collision took place.

The entry in the deck log has most obviously been altered, though the third mate, who made it, denies that there was any alteration. We naturally inquire why this

was done, keeping in mind the inferences to be drawn in odium spoliatoris. The words "slow" and "astern" have been written over erasures. The paper shows this plainly; the longitudinal blue line, on which "slow" is written, and a vertical red line, running through "astern," having been rubbed out. Counsel for the tug and the dumper points out that the word "proceeding" naturally means going ahead; that the expression "proceeding under var. bells" is frequently used, for instance, at 8:30 p. m. of the same night and twice in the entries for the preceding day. He gives reasons quite convincing to me that the word erased was "var.," for "various." The plural "bells" is consistent with various orders, but not with one order to slow. There is nothing to show what word was erased when "astern" was written in. I think it was "ahead," although that word was superfluous, if "proceeding" means going ahead.

I believe the Tuscan was proceeding on her course to New York after she had picked up the pilot and starboarded, so as to shut out her red light and to show her green to the tug and tow, and that there was plenty of water in this space of more than four nautical miles between Scotland Lightship and the Ambrose Lightship for a powerful steamer like the Tuscan, under full steam, to give a wide berth to a slowly moving tug and tow, such as the Helmsman's, even if they were swinging down upon her. When the pilot blew the alarm and rang full speed astern, some three minutes before the collision, he was evidently in a state of great excitement because of the danger of collision. Backing full speed astern for three minutes would have just the effect of carrying the Tuscan's bow to starboard, quite likely as far as north-northeast.

I do not see any inconsistency between the testimony of Clark, the master of the Helmsman, and Lindsay, the mate. Both say the Tuscan showed her red light, heading about north-northeast while she was waiting for the pilot, and that afterwards she got on a course starboard to starboard with the Helmsman and her tow, and showed her green light. It is quite unbelievable that the Tuscan could not have kept well out of the way of the Helmsman and her tow, by the exercise of ordinary care and skill, in these open waters.

[2] We now come to a question of law. It is admitted that the Helmsman and her tow were on the high seas, and not upon the inland waters, when the collision occurred; and that under the International Rules the dumper scows should have carried red and green lights, whereas they only had white lights, in accordance with the rules adopted by the Board of Supervising Inspectors and approved by the Secretary of Commerce applicable to barges towed by steam vessels between Troy and the boundary line of New York Harbor at Sandy Hook, in accordance with section 2 of the Inland Rules (Act May 25, 1914, 38 Stat. 381 [Comp. St. § 7906]). If this fact could have contributed to the collision, the Helmsman and F. J. 22 are also at fault. But the Helmsman did carry the lights required by article 3 of the Inland Regulations (Act June 7, 1897, c. 4, 30 Stat. 96 [Comp. St. § 7877]), which is almost exactly in the same words as article 3 of the International Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 320 [Comp. St. § 7839]). Therefore the pilot and the licensed navigators on the Tuscan, who admit that they saw these towing lights, knew that the Helmsman had a tow of more than one scow and that the tow exceeded 600 feet in length.

Furthermore, the pilot admitted that he saw the two dumper scows from the time he first discovered them, half a mile away, down to the collision. So did the captain and chief mate; the latter, though saying he did not see the lights of the first scow, admitted that he could see the tug and the barges, and the course they were on, without any difficulty. The purpose of the International Rules was accomplished, even if the dump scows did not carry red and green side lights, as required by article 3. No defense of this kind was pleaded, and I find that the failure to comply with the regulation could not have contributed to the collision.

There may be a decree dismissing the libel of the claimant of the Tuscan and its petition under the fifty-sixth rule, with costs, and the usual interlocutory decree in favor of the owner of F. J. 22.